[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 9, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13297

_____

D. C. Docket No. 03-23427-CV-WMH

SIERRA CLUB,
NATURAL RESOURCES DEFENSE COUNCIL, INC.,
NATIONAL PARKS AND CONSERVATION ASSOCIATION,

Plaintiffs-Appellees,

UNITED TRANSPORTATION UNION,

Plaintiff,

versus

LT. GEN. ROBERT L.VAN ANTWERP
Chief of Engineers, Army
Corps of Engineers, et al.,

Defendants,

RINKER MATERIALS OF FLORIDA, INC.
MIAMI-DADE LIMESTONE PRODUCTS ASSOCIATION, INC., et al.,

Intervenor-Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(May 9, 2008)**

Before DUBINA and KRAVITCH, Circuit Judges, and COOGLER,[*] District
Judge.

DUBINA, Circuit Judge:

Sierra Club brought this action against the Army Corps of Engineers
("Corps") after the Corps granted Rinker Materials and other mining concerns
("Miners") Clean Water Act ("CWA") permits. 33 U.S.C. § 1251 *et seq*. The
Miners sought to extract high-quality limestone from the "Lake Belt" area—a
stretch of wetlands between the Florida Everglades and the northwest edge of
metropolitan Miami. To mine the Lake Belt wetlands, however, the Miners had to
first secure CWA permits from the Corps. The Corps, in reviewing whether to
issue permits, had to follow procedures required by the National Environmental
Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., Endangered Species Act ("ESA"),
16 U.S.C. § 1531 *et seq*., and CWA. After the Corps granted the permits, Sierra
Club brought suit, alleging *inter alia* that in granting the permits the Corps

_____

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of
Alabama, sitting by designation.

2

performed its NEPA, ESA, and CWA duties arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Miners intervened as defendants, and all parties moved for summary judgment. The district court granted the Appellees' motion and found that, for numerous reasons, the Miners' permits were due to be vacated. This appeal followed. After reviewing the voluminous record, reading the parties' briefs, and having the benefit of oral argument, we vacate the district court's grant of summary judgment and remand this case to the district court to apply the proper APA standard of review to the Corps's environmental analysis.

## I. Background

South Florida's Lake Belt comprises 60,000 acres of wetlands just east of Everglades National Park and northwest of metropolitan Miami. The Miners own a substantial portion of the Lake Belt and wish to mine their lands. In the late 1990s, at the Miners' urging, the Corps investigated the propriety of issuing 50-year CWA permits to mine 15,800 acres of the Lake Belt. In 1999, the Corps issued a draft Environmental Impact Statement ("EIS") pursuant to NEPA, which recognized the proposed project's negative environmental impacts. The Corps took public comment on the draft, and critics, including multiple federal agencies, raised serious environmental, technical, and legal concerns. Nonetheless, the

3

Corps issued a final EIS the following year largely following the draft EIS. In the final EIS the Corps noted that environmental effects could be mitigated by placing special permit conditions on the Miners. For example, one suggested permit condition contemplated a percentage of mining profits be used to purchase wetlands in the "Pennsuco" area, adjacent to the Lake Belt, for public conservation.

After issuing the final EIS, the Corps released a CWA "public notice" that it planned to issue the mining permits. Part of the notice indicated that the Corps would not engage in ESA "formal consultation" with the U.S. Fish and Wildlife Service ("FWS") because the Corps determined that issuing the permits would have no effect on any species protected by the ESA. The public and several federal agencies heavily criticized the public notice. In particular, the FWS refused to concur in the Corps's "no effect" determination because FWS concluded that the mining might have a detrimental impact on the ESA-protected wood stork. The FWS therefore requested that formal consultation begin between FWS and the Corps.

Also after the EIS, the Corps received information regarding the Northwest Wellfield—Miami-Dade County's primary source of drinking water—and the Pennsuco wetlands. The information showed that the Northwest Wellfield was far more vulnerable to mining-related contamination than was known at the time the

4

Corps approved the permits.  The information showed that property values had risen in the Pennsuco area, such that the mitigation contemplated by the EIS—purchasing wetlands for public conservation to replace the destroyed Lake Belt wetlands—was no longer economically feasible.

In 2001, the Corps responded to the overwhelming criticism and new information by limiting the permits, issuing a new public notice suggesting 10-year permits covering only 5,000 acres.  This limited proposal also received heavy criticism, including the same FWS criticism regarding the impact on the wood stork.  Responding to FWS's concerns, the Corps drafted a biological assessment ("BA") concluding that the Lake Belt mining would have no effect on the wood stork because the wood storks that formerly foraged in the Lake Belt area had shifted locations.  In 2001, the FWS accepted the Corps's BA and concurred in the Corps's "no effect" finding.

The Appellees requested that the Corps draft a supplemental EIS ("SEIS") to address the new information and criticisms, and then reevaluate the permits.  The Corps instead granted the 10-year permits in a final Record of Decision ("ROD").  The ROD described the criticisms and new information, but in the end found that the more-limited mining plan would have no significant effects not already

5

discussed in the EIS.[1]

Shortly after the ROD, the Appellees brought this suit against the Corps challenging the permits. The Miners intervened, and eventually the parties all moved for summary judgment. The court granted the Appellees' motions for summary judgment on several claims and their voluntary motions to dismiss their other claims. The court then "REMANDED to the [Corps] for further development, [but] retained jurisdiction for the purpose of determining an appropriate remedy." DE 73 at 186 (*hereinafter* "Summary Judgment Order"). After the court entered judgment, the Corps moved to dismiss as moot the claims relating to ESA formal consultation with the FWS because the Corps and FWS subsequently engaged in formal consultation related to the Lake Belt permits' effect on the wood stork—the only ESA relief Appellees sought. The Corps otherwise followed the court's judgment, and began work on an SEIS to address the issues the court had raised.

The court denied the motion to dismiss and entered a "Remedies Order" supplementing the Summary Judgment Order and addressing remedies. DE 372;

---

[1] The EIS recognized that mining 21,000 acres "will have an irreversible significant impact on the environmental resources of the region"; the ROD concluded that the permits could issue because the more-limited mining "will not have a significant impact on the quality of the human environment." AR 614 at 81; AR 1028 at 113 ("AR" refers to the administrative record, filed with the district court at DE 19). The only plausible reading of the ROD is that the limited mining "will not have a significant impact on the quality of the human environment" other than the impacts discussed in the EIS.

6

DE 387. The court held that the permits must be vacated, but stayed the vacatur of some permits pending the Corps's release of its SEIS. Specifically, the court stayed the vacatur of any permits licensing mining outside the "60-day range" of the Northwest Wellfield.[2] The Miners appealed. The Corps did not appeal, choosing instead to comply with the district court's judgment and to appear in this appeal as *amicus curiae*.

## II. Jurisdiction

Putting aside the other jurisdictional grounds asserted, we conclude that we have "injunction" jurisdiction over this case under 28 U.S.C. § 1292(a)(1). For an order to be appealable pursuant to § 1292(a)(1), it must be a clear and understandable directive from the district court, it must be enforceable through contempt proceedings, and it must give some or all of the substantive relief sought in the complaint. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). The district court's Remedies Order contains clear, enforceable directives that Sierra Club requested in its complaint. *See* DE 387 at 103-04 (issuing specific orders to Miners); DE 26 at 53 (requesting injunctive relief in amended complaint). For example, the court stated:

In other words, all devegetating, demucking, scraping, blasting, and

---

[2] The 60-day range is the area from which groundwater seepage can reach the Northwest Wellfield's aquifer within 60 days.

7

harvesting of limestone from the aquifer must stop in [the 60-day range] immediately **(no later than 5:00 p.m. on Tuesday, July 17, 2007)**.

DE 387 at 103; *see also id.* at 103-04 (ordering cessation of other activity specific to each mining company). Sierra Club points to the district court's express declaration that it was not issuing an injunction, DE 387 at 31 n.71, but we conclude this is an instance where substance should control over form. The district court issued commands of such specificity and breadth that no litigant would dare violate them. If the Miners had violated the commands, the district court could have initiated contempt proceedings, and it is not clear to us that the court would accept "But you said it wasn't an injunction" as a defense. "In short, we adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1337 (11th Cir. 1998) (Tjoflat, J.).

We furthermore accept pendent jurisdiction over the district court's grant of summary judgment. Like in *Cable Holdings of Battlefield, Inc. v. Cooke*, 764 F.2d 1466, 1472 (11th Cir. 1985), the summary judgment grant provided the basis for the injunction. "Consequently, we cannot properly exercise our jurisdiction under § 1292(a)(1) without also reviewing the grant of partial summary judgment." *Id.*

***III. Merits Discussion***

8

The Summary Judgment Order and its supplemental Remedies Order together span 363 pages containing 617 footnotes. DE 73; DE 387. We commend the district judge for his thorough analysis, but the Orders must be vacated and the case remanded because he failed to grant the Corps the level of deference contemplated by the APA. Though other portions of the district court's analysis may be correct, and may alone support a finding that the Corps acted in an arbitrary and capricious manner, the district court made clear that it remanded to the Corps because of the "cumulative effect" of the Corps's errors. DE 73 at 183-84. On remand the district court should review the Corps's environmental analysis using the proper level of deference, and again determine whether the cumulative effect of any errors requires vacating the permits.

### A. Judgments Underlying the Injunction

First, we must determine precisely which judgments we must address. The four claims in Sierra Club's amended complaint on which the district court granted summary judgment were, in short: an APA-CWA claim against the Corps, because the Corps erroneously held that no practicable alternatives existed, because the Corps improperly balanced the project's benefits and detriments, and because the Corps failed to hold a public hearing, (Claim I); an ESA claim against the Corps, because the Corps's BA erroneously concluded that the mining would have no

9

impact on the endangered wood stork, (Claim III); an APA-ESA claim against FWS for concurring in the Corps's no impact determination, (Claim IV); and an APA-NEPA claim against the Corps, because the EIS failed to meet NEPA's requirements, (Claim V). After the district court granted summary judgment, but before the court issued the Remedies Order, the Corps and FWS undertook ESA formal consultation—the only relief Sierra Club requested for Claims III and IV. It was therefore improper for the district court to rely on those Claims' judgments in crafting a remedy; the claims were moot.[3] Thus, the district court could rely only on its judgments on Claims I and V—APA-CWA and APA-NEPA judgments against the Corps—in issuing the injunction. We therefore review those judgments.

### B. Standard of Review

The APA provides for judicial review of agency decisions like the Corps's decision to grant CWA permits to the Miners and the Corps's NEPA decisions during the permitting process. "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

---

[3] This is not to say that any defendants are entitled to the extraordinary remedy of vacatur of the ESA judgments against the Corps and FWS, an issue we do not reach. Though, as the Miners point out, there is no "summary judgment exception" to mootness, there is a summary judgment exception to dismissal—a judgment must be vacated before underlying claims can be dismissed. *See generally U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994).

capricious, an abuse of discretion, or otherwise not in accordance with law [or found to be] without observance of procedure required by law." 5 U.S.C. § 706(2). "[T]his standard is exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). The court's role is to ensure that the agency came to a rational conclusion, "not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Preserve Endangered Areas of Cobb's History, Inc.* ("*PEACH*") *v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).

### C. NEPA

NEPA establishes procedures that a federal agency must follow before taking any action. The agency initially must determine whether the action to be taken constitutes a "major Federal action"—that is, an action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see* 40 C.F.R. § 1508.18 ("Major reinforces but does not have a meaning independent of significantly. . . ."). If the agency determines that a proposed activity is a "major Federal action," the agency must discuss certain issues in a detailed statement—the EIS. *Id.* On the other hand, if the agency determines that a proposed activity is not a "major Federal action," it must produce a "finding of no significant impact" ("FONSI"), a document "briefly presenting the reasons why an action . . . will not

11

have a significant effect on the human environment." 40 C.F.R. §1508.13.

In some cases, after an agency publishes a FONSI or an EIS, but before any action is taken, the proposed action changes, or the agency receives additional information. In that situation, the agency must make an additional NEPA determination: the agency must determine whether the changes create, or the information reveals, significant effects on the quality of the human environment not previously considered. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374, 109 S. Ct. 1851, 1859, 104 L. Ed. 2d 377 (1989); *see also* 40 C.F.R. § 1502.9(c)(1). If new, significant effects are shown, the agency must prepare an SEIS. 40 C.F.R. § 1502.9(c)(1). When the change to the proposed action is a "minimizing measure," however, the agency "is not automatically required to redo the entire environmental analysis." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1221 (11th Cir. 2002). This is because a minimizing measure's effects on the environment will usually fall within the scope of the original NEPA analysis. *See id.* (holding that road realignment to minimize environmental impact was within the scope of original EIS).

NEPA only requires that an agency follow this procedure; it does not mandate any particular result. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not

12

constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846, 104 L. Ed. 2d 351 (1989). Moreover, an agency's NEPA decisions are only reviewed under the APA's highly deferential standard. *Id.*; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763, 124 S. Ct. 2204, 2213, 159 L. Ed. 2d 60 (2004); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548, 98 S. Ct. 1197, 1214, 55 L. Ed. 2d 460 (1978).

Here, the Corps originally studied the propriety of issuing 50-year permits. Because the Corps found that issuing those permits would be a "major Federal action," it prepared an EIS. AR 614. After severe criticism—specifically, objections regarding the possible contamination of the Northwest Wellfield and possible detrimental effect on the protected wood stork—the Corps adopted a minimizing measure: it reduced the permits' duration to 10 years and limited the permits' acreage. After adopting the minimizing measure and receiving the new information, the Corps issued a FONSI, AR 1028 at 113, best read as an addendum to the 50-year EIS, rejecting the notion that the new information and change in the project were such that an SEIS was required. Three NEPA issues were therefore before the district court: (1) whether the Corps's determination that the 10-year permits would have no significant effect outside the scope of the original EIS was

13

arbitrary, capricious, or an abuse of discretion, AR 1028 (environmental assessment containing Corps's FONSI); (2) whether the Corps's determination that new information regarding contamination of the Northwest Wellfield and effects on the wood stork did not necessitate an SEIS was arbitrary, capricious, or an abuse of discretion, AR 1028; and (3) whether the 50-year permit EIS met NEPA's requirements, AR 614.

A court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA. *Vt. Yankee*, 435 U.S. at 548. This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue. The district court here frequently condemned Corps actions based on simple disagreement, rather than based on a finding that the actions violated the APA's deferential standard.[4]

---

[4] *E.g.*, DE 73 at 65 (holding that groundwater contamination was not "studied adequately" and the Corps was without "sufficient data"); *id.* at 67 ("Corps should have recognized that it lacked essential information and . . . should have been more conservative as to [wellfield contamination] risks."); *id.* at 69 (holding that Corps reliance on technical reports "more than twenty years old" rendered its wellfield contamination discussion inadequate; "[e]ven a non-scientist recognizes that this poses a problem in the ever-changing world of South Florida's ecosystem"); *id.* at 70 (stating that "it was error for the Corps to have paid so little attention to [seepage]"); *id.* at 72 (holding Corps's discussion "far too vague to be in compliance with NEPA, and its open-endedness violates the requirement that permit conditions be

14

Moreover, NEPA is procedural, setting forth no substantive limits on agency decision-making. *Robertson*, 490 U.S. at 350. Simply put, whether the federal agency ends up taking the "major Federal action" at issue has nothing to do with NEPA compliance; NEPA only requires that the agency follow a certain process in deciding whether to take the action. *Id.* In this case, it would not violate NEPA if the EIS noted that granting the permits would result in the permanent, irreversible destruction of the entire Florida Everglades, but the Corps decided that economic benefits outweighed that negative environmental impact. That capricious decision might run afoul of a duty imposed by a different statute, but it would not violate any duty imposed by NEPA. *Cf. id.* at 350-51 ("[I]t would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd. Other statutes may impose substantive environmental obligations on federal agencies, but NEPA

_____

'reasonably enforceable'—found in [a regulation unrelated to NEPA]"); *id.* at 90 (rejecting Corps's interpretation of data and drawing different conclusions); *id.* at 91 (dismissing Corps's mitigation conclusion because "it appears" not enough Pennsuco wetlands will be available for mitigation); *id.* at 92-93 (holding Corps failed to disclose sufficient information); *id.* at 100-01 (rejecting Corps's finding that a "no action" alternative was not economically feasible); *id.* at 101 n.174 (making assumptions to support conclusions contrary to Corps's conclusions); *id.* at 104 (criticizing discussion as "exceedingly brief"); *id.* at 112 (stating that "reliance by the Corps upon applicant-supplied reports . . . must be subjected to special scrutiny").

15

merely prohibits uninformed—rather than unwise—agency action." (footnote omitted)).

The district court's NEPA analysis erroneously focuses on the Corps's decision to take the major Federal action—granting the permits—and the adequacy of the mitigation measures on which the Corps conditioned the permits.[5] Substantive issues like whether to grant the permits and what mitigation conditions to adopt are irrelevant to NEPA compliance. The following passage highlights the district court's flawed belief that NEPA places substantive limits on federal action:

If these permits had been issued as fifty year permits, the Court would

_____

[5] *E.g.*, DE 73 at 69 (criticizing Corps's decision to grant the permits, and the lack of protections placed as conditions); *id.* at 77 ("The Court is troubled by the underlying theme of the Corps' ROD which suggests that the permits at issue have been designed to be extended to the full fifty year mining plan."); *id.* at 78 (stating incorrectly that "Corps was required, by NEPA, to first attempt to avoid [EIS-discussed] impacts and then to minimize whatever was unavoidable, and, finally, to mitigate for any adverse affect"— substantive requirements); *id.* at 79 (stating incorrectly that "Mitigation . . . has been interpreted to require a replacement of the functional value of the wetlands, that is, there should be no net loss of wetland values"); *id.* at 90 (deciding that the "Corps' decisions runs [sic] counter to the evidence"); *id.* at 91 (expressing concern about adequacy of Pennsuco mitigation plan); *id.* at 92 ("The record before the Court suggests that the Corps did not comply with NEPA in preparing the EIS, *nor in issuing the permits*." (emphasis added)); *id.* at 95 (stating that "[i]f the wetlands are going to be destroyed, then mitigation for that loss is required"—a substantive requirement); *id.* at 96 ("[T]he Corps' *permitting decision*—particularly the EIS—does not satisfy NEPA." (emphasis added)); *id.* at 103 ("[T]he permits as issued . . . are not the environmentally preferable alternative . . . . Thus, the Corps' decision was not in compliance with NEPA."); *id.* at 104-05 (expressing dissatisfaction that the Corps intends to allow mining for full 50 years); *id.* at 109 (stating erroneously that "for purposes of the Corps' NEPA analysis, environmental impacts are more important than economic ones, [sic] economic and social impacts have lesser importance than purely environmental or ecological impacts"); *id.* at 112-13 ("[Miners' economic] losses cannot be justification for the possible, even probable, deleterious environmental effects caused by the mining."); *id.* at 114 (speculating that takings litigation "created a costly specter . . . which may have spurred on the destruction of hundreds of acres of wetlands unnecessarily").

16

> have invalidated the permits and *directed the Corps to deny the permits* (rather than simply remanding the case for further study). *Such a conclusion would have been required under NEPA* (and the CWA) because of the significant adverse effects and the Corps' insufficient mitigation and other analyses.

DE 73 at 106 (emphasis added). NEPA can *never* provide grounds for a court to direct a federal agency's substantive decision.

We offer no opinion as to whether the Corps complied with NEPA during the permitting process. We must, however, vacate the district court's orders and remand for the NEPA issues to be decided by the district court in the first instance because the court failed to grant the Corps the proper level of deference and because the court failed to recognize NEPA's limited operation as a procedural, rather than substantive, command to federal agencies. On remand, the district court should address the issues with an eye toward the proper deferential APA standard and NEPA's limited, procedural scope.

### D. CWA

The same pervasive lack of deference infects the district court's APA-CWA analysis.[6] As with its NEPA analysis, the court failed to view the CWA claims

---

[6] We reject the Miners' argument that the APA does not apply to the Corps's performance of its CWA duties and that, as a result, the United States has not waived sovereign immunity as to the Corps. In *Bennett v. Spear*, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997), the Supreme Court rejected this argument in the ESA context, *id.* at 175, and the relevant statutory language in the ESA is almost identical to the analogous portion of the CWA. *Compare* 16 U.S.C. § 1540(g)(1) (ESA), *with* 33 U.S.C. § 1365(a) (CWA). Moreover, the United States persuasively argues in its amicus brief that the APA waives sovereign immunity for Corps CWA

through the deferential lens of the APA.[7]  The judgment on the CWA-APA claim

also is vacated.

## IV. Conclusion

The district court seems to have predetermined the answer to the ultimate

issue, concluding that the Corps should not permit mining in the Lake Belt, and

analyzed the permitting process with that answer in mind.  Indeed, the court made

its predetermination of the ultimate issue explicit in its conclusion:

> Regardless, however, of whether new studies may soon indicate that
> the Aquifer is not being harmed by the mining activities, or that the
> groundwater seepage effects can be minimized, or even if a more
> probing analysis reveals that there truly are no practicable and
> environmentally preferable alternatives to mining in this precious
> resource, the Court's conclusion would be unchanged.

DE 73 at 183.  In other words, no matter what the Corps concluded, and no matter

what evidence supported that conclusion, the court would have banned mining

because of its own conclusion that mining in the Lake Belt is a bad thing.  *Id.* at

_____

decisions.

[7] *E.g.*, DE 73 at 142 (reaching "opposite conclusion" based on "record evidence"); *id.* at 144 (criticizing Corps because "it appears that the Corps too quickly dismissed the alternative of 'no mining' in the Lake Belt"); *id.* at 148 ("Corps made several assumptions, and none are adequately explained in the ROD or elsewhere in the administrative record"); *id.* at 150 (rejecting Corps's conclusion that no practicable alternatives for limestone exist and instead concluding that "[t]he administrative record clearly establishes that, indeed, there are other sources"); *id.* at 154 ("Corps made a clear error of judgment in the analysis of practicable alternatives under the CWA due, in part, to the agency's reliance on a study that should have been independently verified."); *id.* at 157 (disagreeing with Corps's determination that the mining permits would not be contrary to the public interest); *id.* at 162 (holding Corps's decision that public hearing was not required was an abuse of discretion).

184-85. The discretion to grant or deny CWA permits, however, is first given to federal agencies, not federal courts.

Again, we offer no opinion as to whether the Corps complied with NEPA or the CWA during the permitting process.[8] We instead remand to the district court to answer those questions in the first instance, applying the proper standard of review.[9] The APA-CWA judgment, the APA-NEPA judgment, and the Remedies Order are vacated, and the case is remanded for further proceedings consistent with this opinion.

**VACATED** and **REMANDED**.

_____

[8] Our disagreement with Judge Kravitch is exceedingly narrow. The district court's judgment is based on dozens of individual holdings, as is the injunction resting upon that judgment. Judge Kravitch suggests that by affirming a handful of individual holdings—holdings this opinion does not address—this Court can affirm the judgment and injunction in their entirety; we disagree. The district court itself noted that "[e]ven if one or two of the defects were not enough on their own to require remand of this matter [to the Corps], the cumulative effect of these irregularities makes it clear that further environmental analysis should have been conducted and a remand is necessary." Summary Judgment Order at 184. Because the district court found many "irregularities" based on flawed analysis—a proposition with which Judge Kravitch agrees—the court did not properly know the "cumulative effect" when entering judgment and crafting a remedy. Rather than divining whether the district court would enter the same judgment and vast injunction given only a handful of its previous holdings, we think the better course is to vacate the judgment and remand for the district court to address the issues, applying the proper standard of review, in the first instance.

[9] The Miners move to have the case reassigned on remand. We have no reason to believe that the well-respected district judge to whom this case is assigned will not be able to apply the proper standard of review on remand. Furthermore, one element of the decision whether to reassign a case on remand is "whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." _United States v. Torkington_, 874 F.2d 1441, 1447 (11th Cir. 1989) (citing _United States v. White_, 846 F.2d 678, 696 (11th Cir. 1988)). On remand, reassignment would entail substantial waste and duplication because another judge would need to become familiar with the massive record.

19

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

Although I agree with much of the majority's opinion, I must respectfully dissent from its judgment. Specifically, I agree that we have jurisdiction, that the Endangered Species Act claim was mooted, and that the district court's NEPA analysis was erroneous. But I would affirm the district court's disposition of the Clean Water Act claim, as well as its remedial decisions.

First, I agree with the majority that we have appellate jurisdiction over the Summary Judgment and Remedies Orders. The latter order is, in substance, both an injunction, for the reasons explained by the majority, and a final order, because any new mining permits issued in response to the district court's vacatur and remand would be based on a different administrative record, and might well have different terms and conditions. Thus, after the Remedies Order, there was nothing more to be done in the district court with respect to these permits.

Second, the majority is also correct that the Endangered Species Act claim was mooted by the Corps' consultation with the Fish and Wildlife Service. Unlike the majority, however, I believe we should resolve on this appeal whether the mining companies are entitled to vacatur of the ESA judgment. The district court rejected a motion to vacate the ESA claim as moot, and there is no reason to believe the equities have changed since then. Because I would reach this issue, I

20

would hold that the mining companies are not entitled to vacatur. As the leading Supreme Court case makes clear, vacatur of a judgment on appeal is an equitable remedy, and the predominant equitable consideration is whether the mootness is brought about by the party seeking appellate review, by the prevailing party below, or by happenstance. U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994). In particular, when a case becomes moot by the voluntary action of an appellant, vacatur is typically not appropriate. See id. at 26. This rule does equity because when an aggrieved party moots his appeal by his own conduct, he not only abandons his right to appellate review but also forfeits any argument that the preclusive effect of the judgment against him ought to be erased.

Here, the Corps mooted the ESA claim. The Summary Judgment Order determined the Corps was in dereliction of its duties under the Endangered Species Act by failing to consult with FWS about the effects of the instant mining on the wood stork. The Corps acquiesced in this determination by undertaking the consultation required by the ESA. Were it a party to the appeal, the Corps could not obtain vacatur because it mooted the claim. Granted, the mining companies, not the Corps, are the parties now requesting vacatur. But as against the plaintiffs, their equities are no better than those of the Corps, whose decision they benefit from and are defending. The plaintiffs brought this litigation, in part, to force the

21

Corps to comply with the ESA. They won, obtaining summary judgment. The Corps then fulfilled its procedural obligations rather than seek review here. Equity entitles the plaintiffs to maintain their judgment, with the preclusive effect and prevailing party status which accompany it. See, e.g., Morillo-Cedron v. District Director, U.S. Citizenship and Immigration Svcs., 452 F.3d 1254, 1257 (11th Cir. 2006) (discussing prevailing party status). Accordingly, I would expressly deny the vacatur sought by the mining companies.

Next, I turn to the National Environmental Policy Act claims. Again, I agree with the majority that although the district court cited the correct NEPA standard of review, it applied substantially the wrong one. The district court did find procedural faults with the permitting process, and those faults may be a sufficient basis to conclude that the Corps violated NEPA. But the district court's evaluation of procedural NEPA compliance is so intertwined with a substantive critique of the Corps' decision that it is simply impossible for a reviewing court to separate harmless from prejudicial errors.

Yet the district court's NEPA errors are not fatal to its judgment. Because I believe the district court correctly determined that the Corps violated the Clean Water Act in the permitting process, I would affirm on that basis the district court's judgment vacating the permits. Thus, I respectfully dissent from the majority's

22

decision to the contrary. Although the district court made some misstatements of law in its CWA analysis, I believe they are harmless error and that the record contains a sufficient basis to affirm the judgment.[1] I would affirm the district court's disposition of the the CWA claim because the Corps erred (i) by failing to apply the presumption of practical alternatives and (ii) by relying on the Larsen report to establish an absence of practical alternatives without undertaking independent verification of its accuracy.[2]

The pertinent CWA regulations prohibit granting § 404 permits if "there is a practical alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). A presumption that practical, environmentally preferable alternatives exist arises if

---

[1] Unlike the majority, I do not believe the district court's statement about "cumulative" error by the Corps compels the conclusion that every error the district court committed was prejudicial. The district court elsewhere stated that there were multiple, *independently sufficient* grounds for summary judgment. See, e.g., Sierra Club v. Flowers, 423 F. Supp. 2d 1273, 1345 (S.D. Fla. 2006) (five independent NEPA inadequacies in the EIS); id. at 1356 (remand warranted by failure to apply presumption of practical alternatives); id. at 1363 (remand warranted by reliance on Larsen Report). Moreover, the cumulative error statement was itself an alternative holding: the cumulative effect of the Corps' errors warranted remand "even if" one or two such defects would not. The cumulative error statement is too thin a reed upon which to conclude that dozens of otherwise logically independent holdings in fact are not independent, and accordingly that we cannot affirm on grounds sufficient to support the judgment notwithstanding error in the opinion.

[2] As the foregoing implies, I also agree with the majority's reasoning that the Administrative Procedure Act waives federal sovereign immunity concerning challenges to CWA § 404 permits.

23

the "activity associated with a discharge which is proposed for a [wetland] does not require access or proximity to or siting within the [wetland] in question to fulfill its basic purpose (*i.e.* is not water dependent)." 40 C.F.R. § 230.10(a)(3). The presumption that practical, environmentally preferable alternatives exist applies until the proponent of the discharge "clearly demonstrate[s] otherwise." Id. Further, all practical alternatives to discharge in wetlands are presumed to have less adverse impact, unless clearly demonstrated otherwise. Id. Thus, where the presumption applies, the permit applicant bears the burden of providing "detailed, clear, and convincing information proving that an alternative with less adverse impact is impracticable." Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1269 (10th Cir. 2004).[3] Further, such information provided by a permit applicant must be independently verified by the Corps. Id.

Given the language of the regulation, a correct statement of the project's "basic purpose" affects whether the presumption of practicable alternatives applies, and thus the extent of the applicant's burden. See Nat'l Wildlife Federation v. Whistler, 27 F.3d 1341, 1345 (8th Cir. 1994) (determining project purpose is "central" to practicable alternatives analysis). The Corps has discretion to

---

[3] This court has not had many opportunities to interpret 40 C.F.R. § 230.10(a)(3). In our only case to have done so, Fund for Animals v. Rice, 85 F.3d 535, 542 (11th Cir. 1996), it appears the record was clear that no feasible alternatives existed.

characterize the project's basic purpose in the first instance, including whether to accept or reject the applicant's characterization of that purpose. In so doing, the Corps must take the applicant's goals and purposes into account. Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1048 (5th Cir. 1985). But "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." Sylvester v. U.S. Army Corps of Engineers, 882 F.2d 407, 409 (9th Cir. 1989). If an applicant did so and the Corps adopted the applicant's characterization of the project's purpose, the Corps would have abused its discretion.

In other words, the question is how specifically to construe the project's basic purpose. In its Record of Decision, the Corps stated that the basic purpose of this project is to "extract limestone," but the overall project purpose is to provide "construction-grade limestone from Miami-Dade County." In the language of the regulation, the "activity associated with the discharge," limestone mining, does not require "siting within the [wetland] in question to fulfill its basic purpose," extracting limestone. See 40 C.F.R. § 230.10(a)(3). Limestone mining in general is not water-dependent. Cf. National Wildlife Foundation v. Norton, 332 F. Supp. 2d 170, 186 n.13 (D.D.C. 2004). Neither does securing a limestone supply from South Florida require the project to be situated in wetlands, as there are other

25

deposits of limestone located in south Florida.[4] It is only mining this particular limestone that would require the project to be situated in wetlands.

The district court concluded that the Corps, following the lead of the mining companies, construed the project's purpose in an artificially narrow fashion to avoid the presumption of practical alternatives, thereby abusing its discretion. I agree. The Corps effectively construed the project's basic purpose as mining *this* limestone out from underneath *these* wetlands. So construed, a conclusion of water-dependency is inevitable. But such a site-specific formulation of a project's purpose could no doubt be formulated for every permit application, and routine acceptance of such formulations would emasculate the wetlands-protecting presumption, defeating its purpose. Moreover, such a site-specific formulation of a project's basic purpose appears inconsistent with the Corps' formulation of project purposes in other cases. Two simple examples illustrate the point. When an applicant seeks to build houses with boat docks, his project's basic purpose is to build housing, which need not occur on wetlands. (The boat docks are incidental to the basic purpose.) Shoreline Assoc. v. Marsh, 555 F. Supp. 2d 169 (D. Md. 1983), aff'd. 725 F.2d 677 (4th Cir. 1984). In contrast, when a project's basic

---

[4] The mining companies contend these other sites are not feasible sources of limestone because they are underneath either the Everglades or urban areas, and therefore cannot be mined. But that contention addresses whether the presumption of practical alternatives has been rebutted, not whether it applies.

purpose is only to build a boat dock, it is water-dependent. Whistler, 27 F.3d at 1345-46. A project is not water-dependent simply because an applicant asks to do it on wetlands, but only where it literally cannot be done elsewhere.

Of course, limestone mining has to occur where limestone deposits are. So if the Lake Belt contained the only deposits in south Florida, then perhaps a conclusion of water-dependency would be justified. But even assuming that limestone sources from other states and nations are irrelevant to the alternatives analysis, it is conceded that there are limestone deposits elsewhere in south Florida. In my view, that ends the water-dependency issue, regardless of whether the other deposits are inaccessible or of inferior quality. The Corps formulated the project's purpose as simply extracting limestone, or as securing a limestone supply from south Florida. Plainly, there are potential alternative sites to achieve these purposes.[5] If those alternatives are infeasible, the mining companies should be able to make their case that there are no practical, environmentally preferable alternatives. But they should have to bear the higher burden of proof necessary to rebut the presumption of practical alternatives in so doing. In my view, the Corps'

---

[5] Of course, limestone could also be imported from other areas in Florida as well as other states and countries, an alternative whose feasibility the parties dispute sharply. The mining companies contend that utilizing such sources would ultimately result in more environmental degradation than the instant mining plan. Again, I believe this argument addresses whether the presumption that non-wetlands alternatives will be environmentally preferable has been rebutted, not whether the presumption applies.

failure to apply that presumption warranted summary judgment against it on the CWA claim.

Regardless of whether the presumption applies, I would also hold that the Corps erred in relying on the Larsen Report to establish the absence of practical alternatives without independent verification. The Larsen Report was a study prepared by a consultant to the mining industry, and it was the primary source relied upon by the Corps in concluding that no practical alternatives existed to mining in the Lake Belt. Many of its conclusions are repeated nearly verbatim in the Record of Decision. There is no indication in the record that the Corps independently verified the information or conclusions in the Larsen Report. Meanwhile, appellees have challenged the report as biased, arguing that the data underlying it is self-serving and provided by mining company officials, rather than gleaned from independent evaluations of the market for limestone products.

The district court, correctly in my view, concluded the Corps erred by relying on the Larsen Report without undertaking independent verification of its reliability, or at least explaining on the record why, in its expert judgment, it considered the Report's conclusions reliable. The Corps does not err simply because it relies on data submitted by a permit applicant. See, e.g, Friends of the Earth v. Hintz, 800 F.2d 822, 834-35 (9th Cir. 1986). Indeed, an applicant will

frequently be the only party with an incentive to develop such data. Moreover, since the applicant is seeking to obtain a discretionary benefit from the government, it is appropriate for it to bear the cost of developing the data necessary to justify its proposal. But as the cases also reflect, when information submitted by an interested party is "specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate." Van Abbemma v. Fornell, 807 F.2d 633, 642 (7th Cir. 1986); see also Greater Yellowstone Coalition, 359 F.3d at 1269. It is arbitrary and capricious for an agency to rely on such challenged submissions without undertaking some form of independent verification or evaluation. The Corps' own regulations require as much,[6] and an agency's failure to follow its own regulations and procedures is arbitrary and capricious. See, e.g., Simmons v. Block, 782 F.2d 1545, 1550 (11th Cir. 1986) (citation omitted). Courts demand independent verification not to encourage duplication of effort, but to ensure that the Corps' decision-making process is reliable and that deference is afforded to the Corps only where its expertise is meaningfully implicated in the decision to adopt an applicant's conclusions.

---

[6] More specifically, the Corps' NEPA regulations make clear that when the Corps requires an applicant to submit data for an EIS, it must "independently evaluate the information submitted by the applicant and shall be responsible for its accuracy." 40 C.F.R. § 1506.5(a). Moreover, the Corps' regulations contemplate that the alternatives analysis in NEPA documents will also provide the basis for practicable alternatives analysis under the CWA. 40 C.F.R. § 230.10(a)(4). In other words, any duty to verify information submitted by an interested party will typically be the same under both statutes.

29

Of course, the Corps retains its customary discretion in determining the scope and depth of independent verification when it is required, or in explaining why independent verification is unnecessary. For example, in some cases an applicant-submitted report may have indicia of reliability within its four corners, or the challenge to its accuracy may not be credible. Nonetheless, the Corps' discretion is not unbounded; a reviewing court must be satisfied that the agency made a reasoned decision. A conclusory decision to place decisive reliance on contested data submitted by an interested party is not reasoned, and therefore deserves no deference. Yet that appears to be what happened here.

To be clear, I express no view on the accuracy of the Larsen Report. Neither this court nor the district court is equipped to decide that question; the Corps is. The Larsen Report may well be scrupulous and fair. But for all the Corps has explained in the record, it is a classic hired-gun expert report painted over with a thin veneer of rigor.[7] Because plaintiffs raise non-frivolous arguments, unaddressed by the Corps, that the Larsen Report is biased in favor of the mining industry, and because that Report was the primary basis upon which the Corps justified its finding that no practical alternatives exist, I agree with the district court

_____

[7] It is worth noting that during the permitting process, officials from other federal agencies such as the National Park Service noted Larsen's financial alignment with the mining companies and expressed (albeit informally) the view that an independent evaluation would be helpful.

30

that the Corps acted arbitrarily and capriciously in concluding that no practical alternatives exist, and thus in granting the permits. In my view the Corps should, at a minimum, explain on the record why the conclusions about alternatives reached by the Larsen Report are reliable, if the Corps believes them to be so, and why the Corps adopted them. Independent verification by the Corps would be preferable and may be required in the circumstances, although I need not reach that issue because the Corps has made neither an explanation nor an investigation.

In short, I would affirm the district court's grant of summary judgment on the Clean Water Act claim. Having determined that the permits were unlawfully issued, I would also conclude that the district court did not abuse its discretion in its remedial decisions, namely (i) in vacating the permits, and (ii) in refusing to stay its vacatur order as to a portion of the mining area closest to Miami's Northwest Wellfield. I agree, as have most other courts, that the mining companies' desired remedy of remand without vacatur is within a reviewing court's equity powers under the APA.[8] But in deciding whether to remand without vacatur, it is appropriate to consider the balance of equities and the public interest,

---

[8] See, e.g., Chamber of Commerce v. SEC, 443 F.3d 890, 908 (D.C. Cir. 2006); Central Me. Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir. 2001); Nat'l. Org. of Veterans' Advocates v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1380-81 (Fed. Cir. 2001); Central and S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir. 2000); Idaho Farm Bureau Fed'n v. Babbit, 58 F.3d 1392, 1406 (9th Cir. 1995). But see Checkosky v. SEC, 23 F.3d 452, 490-93 (D.C. Cir. 1994) (separate opinion of Randolph, J.); Milk Train, Inc. v. Veneman, 310 F.3d 747, 757-58 (D.C. Cir. 2002) (Sentelle, J., dissenting.) (both arguing the practice is unlawful).

31

along with the magnitude of the agency's errors and the likelihood that they can be cured. See, e.g., Central Me. Power Co., 252 F.3d at 48. Further, the district court received extensive evidence that mining poses a threat of contaminating Miami's drinking water supply with benzene – evidence that apparently was not available to or considered by the Corps during the permitting process. It was not legal error to receive this evidence because once the mining companies requested relief from the typical APA remedy of vacatur, the plaintiffs were entitled to prove that the public interest militated against such relief. Nor do I discern clear error in the district judge's thorough weighing of the evidence to conclude that mining contributed to the benzene contamination, a conclusion which relied in significant part on credibility determinations we are not in a position to disturb. See, e.g., Fischer v. S/Y NERAIDA, 508 F.3d 586, 592 (11th Cir. 2007) (citations omitted) (clear error standard and deference to credibility determinations on appeal). Because vacatur of unlawful agency action is the ordinary APA remedy,[9] and because there was significant record evidence that continued mining during the remand period is contrary to the public interest, I would hold that the district court's remedial decisions were not an abuse of discretion.

Accordingly, because I believe the permits were issued in violation of the

---

[9] See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (vacatur is the "ordinary result" under the APA for unlawful agency action).

Clean Water and Administrative Procedure Acts and the district court's subsequent

decisions were within its remedial discretion, I respectfully dissent from the

judgment.