[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10877
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 03-23427-CIV-WMH

SIERRA CLUB,
NATURAL RESOURCES DEFENSE COUNCIL, INC.,
NATIONAL PARKS CONSERVATION ASSOCIATION,
UNITED TRANSPORTATION UNION,

Plaintiffs-Appellees,

versus

LT. GEN ROBERT L. VAN ANTWERP,
Chief of Engineers, United States Army Corps of Engineers,
SAM D. HAMILTON, US Fish and Wildlife Service,

Defendants,

RINKER MATERIALS OF FLORIDA, INC.,
MIAMI-DADE LIMESTONE PRODUCTS ASSOCIATION, INC.,
VECILLIO AND GROGAN, INC.,
TARMAC AMERICA, LLC,
FLORIDA ROCK INDUSTRIES, INC.,
SAWGRASS ROCK QUARRY, INC.,
APAC-FLORIDA, INC.,
KENDALL PROPERTIES & INVESTMENTS,

Intervenors-Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 21, 2010)

Before EDMONDSON and PRYOR, Circuit Judges, and CAMP,* District Judge.

CAMP, District Judge:

Sierra Club and several other groups (collectively, "Sierra Club") brought

this action against the Army Corps of Engineers ("Corps") challenging permits

issued by the Corps to several limestone mining corporations (the "Mining

Companies"). The permits are required in order to extract limestone from an area

of wetlands in South Florida known as the Lake Belt. In deciding whether to issue

these permits, the Corps must follow the procedural requirements set forth in the

Clean Water Act ("CWA"), 33 U.S.C. § 1344, and the National Environmental

Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Sierra Club contends that the

Corps failed to comply with these procedural requirements when it issued the

permits in 2002, and, thus, the decision to grant the permits was arbitrary and

capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §

*Honorable Jack T. Camp, United States District Judge for the Northern District of
Georgia, sitting by designation.

706. The district court granted Sierra Club's motion for summary judgment and vacated the permits, which the Corps had issued to the Mining Companies.

The Mining Companies appeal the grant of summary judgment for Sierra Club, as well as the vacatur of the permits. We conclude that the district court did not err. We affirm.

## I. BACKGROUND

This litigation presents the Corps with the problem of balancing a number of competing interests that may not be compatible. The Mining Companies represent one interest as the Lake Belt produces approximately half of the total statewide production of construction grade limestone. AR. 927-28. A competing interest is the need for public drinking water in the Miami-Dade area. The Lake Belt currently provides forty percent of Miami-Dade County's (the "County") drinking water. AR 1028 at 5.[1] Yet another possibly conflicting interest is the protection and restoration of the ecology of South Florida, increasingly threatened by mining, development, and agriculture. AR 1028 at 58; AR 614 at 83-85.

### A. Factual Background

The Lake Belt is an area of 57,515 acres of wetlands bordering the eastern edge of Everglades National Park and the northwestern edge of the County. AR

---

[1] "AR" refers to the administrative record, filed with the district court at DE 19.

3

1028 at 2-4; AR 614 at 17. Seventy percent of this land remains in its natural state, while the remaining thirty percent has been altered by rock mining and agricultural activities. AR 1028 at 4; AR 614 at 31, 381. Vegetation coverage for this area "includes wet prairie with varying amounts of melaleuca, tree islands and willow heads, and dense strands of melaleuca."[2] AR 1028 at 4. Most of the wet prairies are found in an area of the Lake Belt known as the Pennsuco wetlands, an area of relatively undisturbed wetlands. AR 618 at 226-28; AR 1028 at 4. A number of wild animal species make their home in the Lake Belt area. AR 614 at 604-06.

The Biscayne Aquifer, a shallow layer of permeable limestone, sits underneath the Lake Belt. AR 1028 at 4-5; AR 614 at 27. This aquifer acts as an underground freshwater reservoir and is the primary source of drinking water for the County. AR 1028 at 4-5. The County operates fifteen public wells in an area of the Lake Belt known as the Northwest Wellfield. AR 1028 at 5. These wells draw drinking water from the Biscayne Aquifer and supply forty percent of the potable water for the County. Id.

The limestone that makes the Biscayne Aquifer an important source of drinking water for Miami-Dade County also makes the Lake Belt a valuable

---

[2] Melaleuca is an invasive species of tree native to Australia that was introduced into South Florida in 1906. AR 614 at 383. Melaleuca has spread throughout the wetlands of South Florida and threatens the ecosystem of the Everglades. Id.

source of limestone to the mining industry. Mining companies own forty-six percent of the land in the Lake Belt, and they have operated open-pit quarries there since the 1950s. AR 1028 at 5, 35. The Corps, however, did not begin regulating mining in this area until the passage of the CWA in 1972. AR 1028 at 35.

For many years, the Lake Belt furnished high-quality limestone essential to development and construction in a large urban area such as Metropolitan Miami. AR 1028 at 5, 35; AR 614 at 876-78, 888. Interestingly, the extraction of the limestone itself converts the wetlands into large fresh water lakes. AR 1028 at 56. After the Mining Companies excavate the limestone, the quarries fill with water, creating the numerous manmade lakes that give the area its name. AR 1028 at 56, 58. By 2002, the Lake Belt contained approximately 5,000 acres of these lakes. AR 1028 at 58.

### B. The Corps Issues Section 404 Permits to the Mining Companies

At the urging of the Mining Companies, the Corps examined issuing 50-year CWA permits to mine 15,800 acres of the Lake Belt. Sierra Club v. Van Antwerp, 526 F.3d 1353, 1357 (11th Cir. 2008) ("Sierra Club I"). NEPA, however, requires that an agency discuss certain issues, including the environmental impact of a proposed action, in a detailed statement prior to taking any action that significantly impacts the quality of the human environment. Id. at

1360; 42 U.S.C. § 4332(C). In accordance with this requirement of NEPA, the Corps issued a draft Environmental Impact Statement ("EIS") in 1999 that was published in the Federal Register. Sierra Club I, 526 F.3d at 1360. After receiving public comment, including objections from other federal agencies, the Corps issued a final EIS in 2000, accompanied by a public notice of its intention to issue the 50-year mining permits. Id. Again, the Corps received a number of objections both from the public and from federal agencies. Id.

In 2001, as a result of objections, the Corps issued a new public notice reducing the permits to a 10-year period. AR 1028 at 11. The Corps also reduced the total acres to be mined by two-thirds. Sierra Club I, 526 F.3d at 1357. A year later, the Corps issued the Record of Decision granting the Mining Companies 10-year Section 404 permits to mine limestone in the Lake Belt. Id. These permits are necessary because the CWA prohibits the discharge of fill materials, like the fill material that results from the excavation of limestone, into wetlands absent a permit issued pursuant to Section 404 of the CWA. See 33 U.S.C. § 1311(a); see also AR 1028 at 58 (discussing the fill material generated from limestone mining in the Lake Belt).

*C. History of the Case*

In 2002, after the Corps issued the Record of Decision,[3] Sierra Club brought this action against the Corps in the district court challenging the permits. The Mining Companies intervened on the side of the Corps. All the sides then moved for summary judgment, and the district court granted Sierra Club's motion for summary judgment. DE 73. The district court also entered a supplemental order vacating the permits, but stayed the vacatur of some of the permits until the Corps issued a Supplemental Environmental Impact Statement. DE 387. The Mining Companies appealed, and, although the Corps did not appeal, it appeared as *amicus curiae*. Sierra Club I, 526 F.3d at 1358. On this previous appeal, this Court held that the district court failed to apply the proper legal standard in reviewing an agency decision under the APA. Id. at 1363. Accordingly, this Court vacated the district court's orders and remanded the case for the district court to apply the proper standard in reviewing the Corps's decision to grant the permits. Id. at 1363-64.

Upon remand, the district court applied the proper standard and again concluded that the Corps's decision to issue the permits was arbitrary and capricious. DE 387. The district court held that the Corps's determination that the basic purpose of the project was water dependant and its conclusion that there are

_____

[3] The Record of Decision is the written explanation of the facts and procedure, which, in the Corps's opinion, support the decision to grant the permits.

7

no practicable alternatives to limestone mining in the Lake Belt were arbitrary and capricious in violation of the APA. In addition, the district court held that the Corps failed to comply with NEPA because it did not take into consideration the impact that limestone mining would have on municipal water supplies, including the potential costs of upgrading water treatment plants.

The Mining Companies have again appealed. They argue that the district court again failed to apply the deferential standard of review mandated by this Court in Sierra Club I and that the district court erred in ruling that the decision to issue the permits was arbitrary and capricious. The Mining Companies consequently contend that the district court erred in vacating the permits. They further argue that the district court failed to follow this Court's mandate, and that this case should be reassigned to another judge. The Corps, however, did not appeal. The Corps is in the process of reconsidering its decision and has issued a supplemental environmental impact statement . For the following reasons, we conclude that the district court did not commit error upon this case's remand.

## II. JURISDICTION

This Court has jurisdiction over an appeal from a final judgment of the district court pursuant to 28 U.S.C. § 1291. See also Sierra Club I, 526 F.3d at 1358 (discussing the Court's jurisdiction over the original appeal).

Although Sierra Club acknowledges that this Court has jurisdiction over the appeal of the district court's order, it contends that the Court should defer ruling pursuant to the doctrine of primary jurisdiction. Specifically, Sierra Club requests that the Court defer ruling until the Corps concludes its ongoing administrative review and makes a final determination whether to reissue the permits based on a supplemental environmental impact statement. "The primary jurisdiction doctrine is . . . concerned with protecting the administrative process from judicial interference." Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1265 (11th Cir. 2000). Primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." Reiter v. Coopper, 507 U.S. 258, 268, 113 S. Ct. 1213, 1220 (1993). "'[T]he main justifications for the rule of primary jurisdiction are the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation.'" Boyes, 199 F.3d at 1265 (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1310 (2nd Cir. 1990)); see also United States v. Western Pac. R.R. Co., 352 U.S. 59, 64, 77 S. Ct. 161, 165 (1956).

Sierra Club has not demonstrated the applicability of the primary jurisdiction doctrine to this case. Moreover, deferring to the Corps does not advance the basic purposes of the doctrine because the specialized knowledge of the Corps is not needed to answer the questions before the Court, and deferral is not necessary for a uniform interpretation of the regulations and statutes at issue. See Western Pac. R.R., 352 U.S. at 64, 77 S. Ct. at 165 ("In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."). Accordingly, the Court declines to apply the doctrine of primary jurisdiction in this case and will not defer its ruling pending a determination by the Corps as to whether it will reissue the permits.

### III. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009). The Corps's decision to grant the Section 404 permits is subject to judicial review under the APA. Sierra Club I, 526 F.3d at 1359-60. A court may only set aside an agency action under the APA where it finds that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541

(11th Cir. 1996) ("On appeal, this court . . . applies the same arbitrary and capricious standard of review utilized by the district court."). The standard of review under the APA is "exceedingly deferential" to the agency. Fund for Animals, 85 F.3d at 541. It is not the role of the reviewing court to substitute its judgment for the judgment of the agency. Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996).

## IV. DISCUSSION

### A. The Corps's Decision to Grant the Mining Companies Section 404 permits Violated the Administrative Procedure Act.[4]

The CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States. 33 U.S.C. § 1311(a); Fund for Animals, 85 F.3d at 542. One exception to this general prohibition is Section 404 of the CWA, which provides that the Secretary of the Army, acting through the Chief of Engineers for the Corps, may issue permits for the discharge of such material into the navigable waters of the United States. 33 U.S.C. § 1344; 33 C.F.R. § 323.6(a); see also Fund for Animals, 85 F.3d at 542. Neither party

---

[4] Although the Mining Companies contend that the district court failed to apply the proper standard of review on remand, we find that the district court complied with Sierra Club I and examined the claims under the APA's more deferential standard of review.

11

disputes that "waters of the United States" encompasses the wetlands at issue in this dispute.

The Environmental Protection Agency, in conjunction with the Corps, developed guidelines to implement the policies expressed by Congress in the CWA. See 40 C.F.R. § 230.1; 40 C.F.R. § 230.2. The Corps must follows these guidelines in deciding whether to issue a Section 404 permit. See 33 U.S.C. § 1344(b); 40 C.F.R. § 230.2; Bering Strait Citizens for Responsible Resource Dev. v. United States Army Corps of Eng'rs, 524 F.3d 938, 946-47 (9th Cir. 2008) These guidelines provide that the Corps shall not grant a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

The guidelines require that the Corps follow a specific two step procedure in applying this standard. First, a correct statement of the project's "basic purpose" is necessary. See 40 C.F.R. § 230.10(a)(3). The Corps defines a project's basic purpose. See 33 C.F.R. Part 325, App. B(9)(b)(4); Sierra Club I, 526 F.3d at 1366 (Kravitch, J., concurring in part and dissenting in part). Second, after the Corps defines the basic purpose of the project, it must determine whether that basic purpose is "water dependent." See 40 C.F.R. § 230.10(a)(3).

An activity is "water dependant" if it requires access or proximity within a wetland to fulfill its basic purpose. Id. For example, when a project's basic purpose is to provide boat access to the Missouri River, that activity is water dependant because it requires that the applicant locate the project in water to achieve its basic purpose. Whistler 27 F.3d at 1345-46. In contrast, a gold mining project located in a watershed is not water dependent. See Bering Strait, 524 F.3d at 947 (applying the presumption that practicable alternatives exists for an Alaskan gold mining project because the project was not water dependent).

If the activity is not "water dependant," the guidelines require that the Corps apply a presumption that a practicable alternative that has a less adverse environmental impact on the wetland is available. 40 C.F.R. § 230.10(a)(3). When this presumption applies, the applicant must then rebut the presumption by "clearly demonstrat[ing]" that a practicable alternative is not available. Id. In addition, unless the applicant clearly demonstrates otherwise, the Corps presumes that all practicable alternatives that do not involve the discharge into a wetland have a less adverse environmental impact. Id. Where the presumption applies, the permit applicant bears the burden of providing "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1269 (10th Cir. 2004)

13

(internal quotations and citation omitted). Moreover, the Corps may rely on information submitted by the applicant but must independently verify such information. Id.; 40 C.F.R. § 1506.5(a).

The guidelines make the definition of a project's "basic purpose" essential to the Corps's decision whether to grant a Section 404 permit. The Corps must initially determine whether the "basic purpose" is water dependant. This decision, in turn, dictates the rest of the required procedure, such as the presumption that practicable alternatives exist. See 40 C.F.R. § 230.10(a)(3). The Corps's determination of a project's basic purpose and whether it is water dependent are threshold questions that determine the procedure the Corps must follow in granting the applicant a permit. If the wrong decision is made, the required procedure will not be followed and the decision will be arbitrary.

In the Record of Decision, the Corps set forth the basic purpose of the Mining Companies' project. The Corps explained that "[t]he basic project purpose is to extract limestone." AR 1028 at 8. The parties do not challenge the Corps's statement of the basic purpose. The Corps then determined that the activity - limestone mining - was water dependent because it needed "to be located in a special aquatic site to fulfill its basic purpose." AR 1028 at 59. Because the Corps determined that the activity was water dependent, it neither applied the

14

presumption that practicable alternatives to mining limestone in the Lake Belt are available nor required the Mining Companies to rebut this presumption.

As the Mining Companies conceded at oral argument, the extraction of limestone in general is *not* water dependent; mining limestone does not *always* require that the mine be located in a wetland. The Mining Companies, however, contend that the Lake Belt project is water dependent because limestone mining requires that the mine sit where the limestone deposits are located, and these deposits happen to be situated in wetlands. The Corps, however, did not define the basic purpose of this project as the mining of limestone in the Lake Belt. See AR 1028 at 8. Rather, the Corps defined the basic purpose as the extraction of limestone in general. Id. Contrary to the Corps's determination, this basic purpose is not water dependent.

The district court properly concluded that the decision that the project's basic purpose was water dependent was arbitrary. By finding that the project was water dependent, the Corps failed to apply the presumption that practicable alternatives to mining limestone in the Lake Belt are available and did not shift the burden to the Mining Companies to clearly demonstrate that there are no practicable alternatives to mining in the area. See 40 C.F.R. § 230.10(a)(3). This procedural failure by the Corps flaws its subsequent determination regarding the

15

availability of practicable alternatives in violation of its own regulations.

This is not to say that the Mining Companies will be unable to satisfy their burden and demonstrate that there are no practicable alternatives to mining limestone in the Lake Belt, but the Mining Companies should first have to satisfy their burden before the Corps prior to this Court conducting a review of the Corps's determination regarding practicable alternatives. By finding that the project's basic purpose was water dependant and failing to apply the required presumption, the decision by the Corps to issue Section 404 permits was arbitrary and capricious.

B. *The District Court did not Abuse its Discretion by Vacating the Permits.*

The APA provides that the reviewing court shall set aside any agency action that is arbitrary and capricious. 5 U.S.C. § 706. After finding that the Corps's decision to grant the permits was arbitrary and capricious, the district court vacated the permits. We find that the district court did not abuse its discretion under the APA by vacating the permits.[5]

---

[5] Having found that the Corps's decision to issue the permits was arbitrary and capricious as a result of its failure to apply the practicable alternatives presumption and that the district court's vacatur of the permits was proper, the Court need not address the district court's further determinations that the Corps erroneously relied on the Larson Report and violated NEPA by failing to consider the estimated costs to the County for upgrades to its water treatment systems or whether such upgrades were reasonably foreseeable. DE # 491 at 29.

16

## V.  CONCLUSION

We **AFFIRM** the summary judgment in favor of Sierra Club.