**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1506
_____

DELAWARE RIVERKEEPER NETWORK;
MAYA VAN ROSSUM, the Delaware Riverkeeper,
                                            Petitioners

v.

UNITED STATES ARMY CORPS OF ENGINEERS,
                                            Respondent

Tennessee Gas Pipeline Co.,
                                            Intervenor
_____

On Petition for Review from the United States Army
Corps of Engineers
CENAP-OP-R-2015-0802-65

Argued July 13, 2017

Before: SMITH, *Chief Judge,* NYGAARD, and
FUENTES, *Circuit Judges*

(Filed: August 23, 2017)

Aaron J. Stemplewicz          **[ARGUED]**
Delaware Riverkeeper Network
925 Canal Street
Suite 3701
Bristol, PA  19007
       *Counsel for Petitioners*

Varu Chilakamarri          **[ARGUED]**
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC  20044

Michael T. Gray
United States Department of Justice
Army Corps of Engineers
701 San Marco Boulevard
Jacksonville, FL  32207

David C. Shilton
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC  20026

*Counsel for Respondent*

Pamela S. Goodwin
Saul Ewing
650 College Road East
Suite 4000
Princeton, NJ  08540

Patrick F. Nugent
John F. Stoviak                              **[ARGUED]**
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA  19102

Elizabeth U. Witmer
Saul Ewing
1200 Liberty Ridge Drive
Wayne, PA  19087
*Counsel for Intervenor Respondent*

_____

OPINION OF THE COURT
_____

SMITH, *Chief Judge*.

3

Tennessee Gas Pipeline Co. ("Tennessee Gas") submitted applications to several federal and state agencies seeking approval to build an interstate pipeline project. One such agency is the United States Army Corps of Engineers,[1] which administers certain provisions of the Clean Water Act. The Corps issued a permit approving the project. The petitioners, Maya van Rossum and Delaware Riverkeeper Network (collectively, "Riverkeeper"), challenge that decision on the ground that the Corps acted arbitrarily and capriciously by rejecting a "compression" alternative.

We conclude that the Corps considered the compression alternative but rejected it for reasons supported by the record. While the compression alternative would disturb less land, its impact would be mostly permanent. The pipeline project would disturb more land, but its impact would be mostly temporary. In making a policy choice between those environmental tradeoffs, the agency's discretion was at its apex. We will therefore deny the petition for review.

---

[1] A companion case addresses challenges to the Pennsylvania Department of Environmental Protection, which granted a permit under state law approving the pipeline project. *See Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, No. 17-1533 (3d Cir. 2017).

I

A

At issue is the Orion Project—12.9 miles of pipeline looping[2] that would transport an additional 135,000 dekatherms per day of natural gas through Pennsylvania. Approximately 99.5% of the new pipeline would run alongside existing pipelines. According to Riverkeeper, construction will lead to deforestation, destruction of wetland habitats, and other forms of environmental damage. Riverkeeper asserts that such damage can be avoided by building or upgrading a compressor station. "Compressor stations . . . us[e] gas- and electric-powered turbines to increase the pressure and rate of flow at given points along the pipeline's route." *Del. Riverkeeper*

---

[2] "Installation of 'looping' along a pipeline involves the construction of 'additional sections of pipe, laid parallel to portions of the existing pipe, which empty into the existing pipe at both ends of the loop pipeline.'" *Algonquin Gas Transmission Co. v. F.E.R.C.,* 948 F.2d 1305, 1309 n.4 (D.C. Cir. 1991) (further internal quotation marks omitted) (quoting *ANR Pipeline Co. v. F.E.R.C.*, 771 F.2d 507, 510 (D.C. Cir. 1985)); *see also Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 369 (3d Cir. 2016) ("'Loops' are sections of pipe connected to the main pipeline system that reduce the loss of gas pressure and increase the flow efficiency of the system.").

*Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 369 (3d Cir. 2016). Building or upgrading a compressor station would increase the amount of natural gas transported through existing pipelines and thus avoid any need to build pipeline looping.[3]

Contrary to Riverkeeper's concerns, the agencies concluded that the Orion Project would result in "minimal" and "temporary" environmental impact. Of the 12.9 miles of pipeline looping, fewer than 2 miles would cross wetlands or waterbodies. The pipeline would be buried 2–3 feet beneath the ground, and all disturbed areas would be restored to their original elevations and contours with no net loss of wetlands. However, nearly five acres of forested wetlands would be de-forested and converted into emergent wetlands. The compression alternative, by contrast, would require constructing one or more permanent fixtures—causing permanent deforestation as well as light, air, sound, and greenhouse gas pollution.

---

[3] The parties focus primarily on building one or more new compressor stations rather than upgrading an existing station. *See* JA 2010 ("[U]pgrades to existing compressor stations, without looping, did not offer the same reliability and flexibility on the system."). We focus our analysis accordingly.

With that initial background in mind, we next set forth a brief overview of the administrative scheme and then describe how that process unfolded in this case.

B

Under the Natural Gas Act of 1938, the Federal Energy Regulatory Commission ("FERC") is the "lead agency" for evaluating interstate pipeline projects. 15 U.S.C. § 717n(b). As part of that role, FERC performs a technical environmental analysis pursuant to the National Environmental Policy Act ("NEPA"). *Id.*

NEPA requires FERC to take a "hard look" at the environmental impact of the proposed project. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). If the project involves a "major Federal action" that would "significantly affect[] the quality of the human environment," FERC must prepare a detailed Environmental Impact Statement. 42 U.S.C. § 4332(C). Otherwise, FERC need only prepare a concise Environmental Assessment. 40 C.F.R. §§ 1501.3, 1501.4, 1508.13.

As a condition of FERC's approval, the applicant is required to obtain any additional state or federal licenses required by law. For example, because the Orion Project would discharge "dredged or fill material" into the "waters of the United States," Tennessee Gas was required to

7

obtain a permit under Section 404 of the Clean Water Act. 33 U.S.C. §§ 1344(a), 1362(7).

The United States Army Corps of Engineers reviews applications for Section 404 permits. In doing so, the Corps applies the so-called Section 404 Guidelines ("the Guidelines") issued by the Environmental Protection Agency. *See* 33 C.F.R. § 320.4. *See generally Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009). Among other things, the Corps may not issue a permit where there is a "practicable alternative" with less adverse impact on the aquatic ecosystem, "so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

In performing its alternatives analysis, the Corps may rely on the environmental report prepared by FERC pursuant to NEPA. The agencies memorialized their cooperative relationship in a 2005 Memorandum of Understanding, which states that the Corps will "use the FERC record to the maximum extent practicable and as allowed by law . . . . [T]he Corps will give deference, to the maximum extent allowed by law, to the project purpose, project need, and project alternatives that FERC determines to be appropriate for the project." JA 39.[4]

---

[4] The Memorandum of Understanding between FERC and the Corps supplements an Interagency Agreement between FERC and nine other federal agencies pursuant to

C

*1. Tennessee Gas's application.* On October 9, 2015, Tennessee Gas submitted an application to FERC for approval of the Orion Project. Its application included an Environmental Report, which discussed and rejected compression alternatives. Tennessee Gas explained that building compressor stations would require Tennessee Gas "to obtain approximately 40-acres per site (total of 80 acres)." JA 408. Building compressor stations would also require "permanent vegetation clearing from the area in order to install permanent access roads, fencing, buildings and other appurtenance equipment," and would create "light pollution and noise impacts and may also become a source of [greenhouse gas] emissions." *Id.* But with the Orion Project, "the new [right-of-way] will be allowed to re-vegetate to minimize and mitigate possible environmental impacts." *Id.* The report further concluded that the "compression alternative would result in higher Project operating and fuel costs." *Id.*

*2. Public notice.* On December 3, 2015, FERC issued a Notice of Intent and solicited public comments regarding the Orion Project. FERC specifically requested comments on "reasonable alternatives." JA 560. On June 10, 2016,

---

Executive Order 13212 ("Actions to Expedite Energy Related Projects," May 18, 2001).

the Corps issued its own public notice of the Section 404 permit application.

*3. FERC's draft Environmental Assessment.* In July 2016, FERC circulated a non-public draft Environmental Assessment to the Corps for internal comment. The draft specifically considered and rejected a possible compression alternative, as conveyed in a detailed chart. While the draft Environmental Assessment concluded that compression would be "technically feasible," its "economic efficiency" would be "lower" and it would "require permanent land use conversion" and present a new source of light, air emissions, and noise. JA 212. The draft characterized compression's environmental impact as "different," "comparable," and "possibly lower" than the Orion Project. But ultimately, the draft concluded that the aboveground footprint of building a compression station is "permanent," whereas "the bulk of the Project impacts are temporary (such as waterbody crossings) or adjacent to the existing right-of-way." *Id.*

*4. Final Environmental Assessment.* On August 23, 2016, FERC published its Environmental Assessment for public comments—requesting that comments "focus on the potential environmental effects, reasonable alternatives, and measures to lessen or avoid environmental impacts." JA 239. For reasons that are not clear from the record, the final Environmental Assessment omitted the draft's analysis of the compression alternative. The final assessment did, nonetheless, recommend a

10

"finding of no significant impact" because the Orion Project's "impacts on waterbodies and wetlands would be minor and temporary." JA 340, 274, 278.

*5. Public Comments.* Before the publication of the Environmental Assessment, "[n]one of the environmental comments received on the Orion Project identified specific alternatives to the proposed looping segments." JA 335. After publication, groups including Riverkeeper commented on alternatives but never specifically addressed compression.

The Corps received no public comments and received no requests for a public hearing.

*6. FERC Order Issuing a Certificate.* On February 2, 2017, FERC published its Order Issuing a Certificate, approving the Orion Project and issuing a "certificate of public convenience and necessity." 15 U.S.C. § 717f(c). FERC explained that it "evaluated alternatives to the Orion Project to determine whether they would be reasonable and environmentally preferable to the proposed project," and "affirm[ed] the conclusion in the [Environmental Assessment] that no reasonable alternative would result in significantly less environmental impacts and accomplish the project's objective." JA 635.

The Order also noted that "[w]hile Delaware Riverkeeper presents general alternatives that would potentially result in less impact, Tennessee's application

11

and its response to Delaware Riverkeeper's comments provide further evidence that the Orion Project could not be satisfied by relying on other transportation systems or looping, *compression*, and route alternatives along Tennessee's own system." JA 635 (emphasis added).

*7. Corps Considers and Issues a Section 404 Permit.* Concurrently with the FERC process, the Corps reviewed Tennessee Gas's application for a Section 404 permit. The Corps issued its permit on the same date as FERC's order, February 2, 2017. The Corps incorporated the Environmental Assessment into its findings—concluding that the water impacts would be "temporary in nature" and the project would have a "[n]egligible effect." JA 432–34. The Corps further concluded that "there are no reasonable or practicable alternatives" for which there would be no "significant adverse environmental effects," and that the Orion Project complies with the Guidelines. JA 445–46, 438. Construction was authorized to begin on March 15, 2017.

*8. Litigation.* Riverkeeper filed this petition on March 10, 2017. Tennessee Gas filed a motion to intervene, which the Court granted on March 17, 2017. On April 7, 2017, this Court denied Riverkeeper's emergency motion for a stay. On April 26, 2017, this Court granted Riverkeeper's motion to expedite the case.

## II

We have jurisdiction to review this petition under the Natural Gas Act. Where an interstate pipeline project is proposed for construction, *see* 15 U.S.C. § 717f, we have "original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than [FERC]) . . . acting pursuant to Federal law to issue . . . any permit, license, concurrence, or approval . . . required under Federal law," 15 U.S.C. § 717r(d)(1).

We review for arbitrary or capricious agency action. 5 U.S.C. § 706(2)(A). Under that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "We will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## III

Before reaching the merits, we must first address whether Riverkeeper waived (or forfeited) its claims. We conclude that it did not. Although Riverkeeper failed to raise the compression alternative in its comments,

compression was otherwise brought to the agency's attention. Furthermore, Riverkeeper's failure to raise arguments before FERC does not waive its objections to a decision by the Corps.

Challenges to agency action under NEPA are subject to a prudential waiver rule. Before bringing their NEPA challenges in court, parties must "structure their participation" in the administrative process "so that it . . . alerts the agency to the [parties'] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (alteration in original) (internal quotation marks omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.,* 435 U.S. 519, 553 (1978)). Under that standard, a challenger who claims that an agency failed to consider an environmentally preferable alternative must generally raise that alternative in its comments. *Id.* at 764–65.

Courts have recognized two exceptions to the prudential waiver rule. "First, commenters need not point out an environmental assessment's flaw if it is 'obvious.' Second, a commenter does not waive an issue if it is otherwise brought to the agency's attention." *Sierra Club,*

14

*Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015) (citation omitted) (quoting *Pub. Citizen*, 541 U.S. at 765).[5]

In this case, Riverkeeper actively participated in the administrative process but never raised what has now become its central argument—that compression is a legally mandated alternative. According to the Corps and Tennessee Gas, Riverkeeper was required to raise that objection before FERC. We need not address whether the prudential waiver rule applies in this case where Riverkeeper brought challenges under the Clean Water Act only, not NEPA. And even if the rule did apply, Riverkeeper has not waived its claims for two reasons.

First, the compression alternative was "otherwise brought to the agency's attention." *Bostick*, 787 F.3d at 1048. Tennessee Gas addressed the compression alternative in its initial application to FERC and in its follow-on application to the Corps. And as described below, the Corps considered and rejected the compression alternative. It did so for substantially the same reasons set forth in Tennessee Gas's application. The compression

---

[5] The Ninth Circuit treats these two exceptions as one. *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) ("This court has interpreted the 'so obvious' standard as requiring that the agency have independent knowledge of the issues that concern petitioners."). But whether there is one exception or two, in either case, an exception applies here.

alternative is thus fair game for litigation and cannot come as a surprise to the Corps.

The Corps objects that "the *general idea*" of compression may have been before it, but not Riverkeeper's "*particular alternative*." Resp. Br. 21. But the crux of Riverkeeper's argument—that compression would have a smaller environmental impact—does not rely on any specific implementation of the compression alternative that was never presented to the agency.[6] *See Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. 12-cv-9861, 2016 WL 4650428, at *76 (C.D. Cal. Feb. 1, 2016). Riverkeeper's basic argument was considered (and responded to) in Tennessee Gas's application, JA 408, and was further discussed in FERC's draft Environmental Assessment, *see* JA 212 (characterizing compression's environmental impact as "different," "comparable," and "possibly lower"). Because the Corps "had independent knowledge of the very issue that concerns [petitioner] in this case, . . . 'there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.'" *'Ilio'ulaokalani Coal. v.*

---

[6] Riverkeeper does dispute Tennessee Gas's position that two compressor stations would be needed to fulfill the project's purpose. According to Riverkeeper, only one new station would be required. But as explained below, that dispute is not ultimately material to our conclusion.

16

*Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006) (quoting *Pub. Citizen*, 541 U.S. at 765).

Second, the Corps' process made it impracticable for Riverkeeper to lodge its objections with the Corps. The Corps opened its thirty-day comment period on June 10, 2016, but FERC did not publicly release its Environmental Assessment until August 23, 2016—after the expiration of the Corps' comment period. Any deficiencies with the Environmental Assessment for purposes of the Clean Water Act thus could not have been addressed to the Corps by comment.

To be sure, Riverkeeper had every opportunity to object before FERC. It never did, including in its petition for rehearing filed February 14, 2017, most likely waiving its right to challenge FERC's treatment of the compression alternative in court. *See* 15 U.S.C. § 717r(b). For that reason, Tennessee Gas characterizes this action against the Corps as a "disingenuous[]" collateral attack against FERC. Intervenor Br. 19.

Certainly Riverkeeper could have raised its objections with FERC, and FERC might have communicated those objections to the Corps. But notwithstanding the agencies' cooperative relationship, each must fulfill independent legal responsibilities. In particular, FERC's analysis under NEPA is substantively different than the Corps' analysis under the Clean Water Act. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1186 (10th Cir.

17

2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) (noting that, unlike the Clean Water Act, "NEPA does not require the selection of the least damaging practicable alternative"). For that reason, an Environmental Assessment might be sufficient for purposes of NEPA but not for purposes of the Clean Water Act. The Guidelines contemplate that possibility and require the Corps to "supplement [deficient] NEPA documents with . . . additional information." 40 C.F.R. § 230.10(a)(4). Thus, a party might have a viable objection before the Corps but not before FERC. At bottom, the Corps and Tennessee Gas ask us to ignore Riverkeeper's arguments because those arguments were not raised before a different agency administering a different statute. We decline to do so.

Even if the prudential waiver rule applies in this case, we conclude that Riverkeeper did not waive its arguments. The compression alternative was brought to the Corps' attention, and Riverkeeper was not required to present its Corps-specific objections to FERC. We proceed, then, to the merits.

## IV

Riverkeeper argues that the Corps' decision to issue a Section 404 permit was arbitrary and capricious for three reasons: (1) the Corps adopted an irrationally narrow definition of the project's "basic purpose"; (2) the Corps failed to consider the compression alternative; and (3) the

Corps improperly rejected the compression alternative. We reject each argument in turn.

A

First, Riverkeeper argues that the Corps adopted an irrationally narrow definition of the project's "basic purpose," precluding alternatives like compression. We reject this argument for two reasons. First, Riverkeeper conflates the separate roles played by a project's "basic purpose" and "overall purpose." Second, any error arising from the project's definition is harmless.

Under the Guidelines, the Corps is required to conduct an alternatives analysis. But what counts as an alternative? To determine that, the agency looks to the range of projects that could achieve the same goal as the proposed project. "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*." 40 C.F.R. § 230.10(a)(2) (emphasis added).

Erroneously defining the "overall project purpose" can be consequential. If it is defined too narrowly, the Corps might arbitrarily constrict the universe of viable alternatives. *See Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1002 (9th Cir. 2013) ("[T]he Corps may not manipulate the project purpose so as to exclude alternative sites . . . ."); *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) ("Obviously, an applicant

19

cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable.").

Separately, the Corps is required to determine whether a project is "water dependent." 40 C.F.R. § 230.10(a)(3). For that, the Corps evaluates whether the project "require[s] access or proximity to or sit[s] within the special aquatic site in question to fulfill its *basic purpose*." *Id.* (emphasis added). We will return to water dependency in a later section. For now, it is enough to understand that the *basic* purpose (for determining water dependency) is distinct from the *overall* purpose (for determining practicable alternatives).

In this case, FERC and the Corps[7] adopted the following definitions:

- *Overall project purpose*: "to increase natural gas transportation in order to respond to the needs of three contracted shippers."

---

[7] Under the regulatory scheme, FERC defines the project's basic and overall purposes. Then, pursuant to the Memorandum of Understanding, "the Corps will give deference, to the maximum extent allowed by law, to the project purpose." JA 39.

20

- *Basic project purpose*: "to construct natural gas pipeline loops."

JA 430–31. Riverkeeper argues that the Corps adopted too narrow a definition of the project's basic purpose. By limiting the definition to "pipeline loops," Riverkeeper argues, the Corps excluded alternatives like compression. In Riverkeeper's view, the Corps could reject compression because it would not constitute an alternative method of achieving the project's basic purpose, "construct[ing] natural gas pipeline loops." JA 431.

But as described above, the project's *basic* purpose does not delimit the agency's alternatives analysis. The *overall* purpose does. *See All. For Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 548 (M.D.N.C. 2004) ("Once the Corps determines the water dependency of a project, it no longer considers the basic project purpose but analyzes practicable alternatives in light of overall project purposes." (internal quotation marks omitted)). Here, the *overall* purpose was not defined in such a way as to exclude the compression alternative. Compression could very well be an alternative method of "increase[ing] natural gas transportation," JA 430, provided it also satisfied the other regulatory requirements. *See Gouger v. U.S. Army Corps of Eng'rs*, 779 F. Supp. 2d 588, 606 (S.D. Tex. 2011) (collecting cases, and observing that "an 'overly narrow' project purpose is a rare occurrence").

But even assuming, *arguendo*, that the agency erroneously defined the project's basic purpose, such an error does not categorically compel us to reverse the agency's permitting decision. "[T]he Administrative Procedure Act (APA) directs us to take account of 'the rule of prejudicial error.' In other words, we apply a 'harmless error' analysis to any administrative action we review[.]" *Del. Riverkeeper,* 833 F.3d at 377 (footnotes omitted). As described below, the Corps considered the compression alternative. Furthermore, the Corps did not reject the compression alternative on the ground that it could not achieve the project's basic purpose.

Both in principle and in practice, the project's "basic purpose" did not arbitrarily constrain the Corps' alternatives analysis. We therefore reject Riverkeeper's first argument.

B

Riverkeeper next argues that the Corps failed to consider the compression alternative.[8] We reject that argument. Despite being omitted from FERC's Environmental Assessment, compression was evaluated in

---

[8] Riverkeeper abandoned this argument. *See* Transcript of Oral Argument at 13:3–5 ("It did review it. Yes, no doubt that they did review the compression alternative."). We will still briefly address it in the interest of thoroughness.

22

Tennessee Gas's application and expressly referenced in the Corps' findings.

Tennessee Gas's application to the Corps included an alternatives analysis that explicitly discussed compression. *See* JA 69. The Corps' alternatives analysis cross-references Tennessee Gas's application and expressly identifies compression as one of the alternatives considered. *See* JA 438 ("[Tennessee Gas] examined several alternatives . . . including . . . Compression Alternatives . . . ."). That statement is sufficient to persuade us that the Corps in fact considered compression as part of its alternatives analysis.[9]

Riverkeeper objects that FERC's final Environmental Assessment never mentioned compression. Indeed, the final document stated that FERC "did not evaluate any aboveground facility site alternatives." JA 335. According to Riverkeeper, FERC's failure to address compression becomes the Corps' failure as well. Even granting that FERC had abandoned its analysis of compression, the Corps did not solely review the contents of FERC's Environmental Assessment. *See* JA 445 ("[T]his office has

---

[9] Our conclusion is further supported by FERC's draft Environmental Assessment, which specifically analyzed the compression alternative. *See* JA 210–12. But because the draft was not made publicly available and was not referenced in the Corps' findings, we do not give it dispositive weight.

23

reviewed all the available information contained in the Environmental Assessment prepared by FERC dated August 2016, *and supporting documents . . . .*" (emphasis added)); *id.* ("Based on a review of *all information contained in the application file* and extensive coordination with the applicant [Tennessee Gas] *. . . .*"(emphasis added)); *see also* JA 438 (discussing Tennessee Gas's alternatives analysis, and concluding that "the alternatives analysis carried out . . . was commiserate [sic] with the level of impact").

Accordingly, we conclude that the Corps did not arbitrarily or capriciously ignore the compression alternative.

C

We next consider whether the Corps rejected the compression alternative for rational reasons in accordance with the applicable law. We conclude that it did.

According to Riverkeeper, the Corps did not comply with two regulations when it rejected the compression alternative. First, Riverkeeper argues that the Corps failed to make sufficient findings under 40 C.F.R. § 230.10(a). Second, Riverkeeper argues that the Corps was required to hold Tennessee Gas to a heightened standard under 40 C.F.R. § 230.10(a)(3) and failed to do so. We address each argument in turn.

24

First, Riverkeeper argues that the Corps erroneously rejected the compression alternative by failing to make appropriate findings under 40 C.F.R. § 230.10(a). We reject that argument.

Under that regulatory provision, "no discharge of dredged or fill material shall be permitted if there is a [1] practicable alternative to the proposed discharge [2] which would have less adverse impact on the aquatic ecosystem, [3] so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Riverkeeper argues that the compression alternative satisfies all three conditions.

We agree with Riverkeeper that compression meets the first two prongs, but the Corps properly concluded that compression would "have other significant adverse environmental consequences." *Id.*

*a. Practicability.* First, the Corps may reject an alternative if it is not practicable. *Id.* "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

The Corps argues that, based on information in Tennessee Gas's application and the draft Environmental

Assessment, compression would result in "higher Project operating and fuel costs," JA 408, and would have lower "economic efficiency" than the Orion Project, JA 211. The Corps argues that "this information alone would support a finding that the compression alternative was not 'practicable' under the Guidelines." Resp. Br. 32.

First, the fact that an alternative might have some unquantified higher operating cost does not mean the alternative is not "available" or "capable of being done." 40 C.F.R. § 230.10(a)(2). More information would be required to reach that conclusion. *Cf. Jones*, 741 F.3d at 1002 (finding an alternative impracticable because "no one would seek financing to build a refining facility if it were not possible to extract a sufficient quantity of minerals to make the project profitable").

Second, while the Corps' alternatives analysis discussed the *environmental* implications of the Orion Project relative to the alternatives, it never once mentioned costs or practicability. *See* JA 438. We are unable to "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). To be sure, the Corps' "Conclusion" section asserts that "there are no reasonable or practicable alternatives." JA 446. But the agency did not articulate any reasoning in support of that conclusion, let alone any reasoning applicable to compression. The absence of any reasoning is especially critical in light of FERC's draft

26

Environmental Assessment, which concluded that building a new compressor station *would* be practicable. *See* JA 212 ("This alternative meets the purpose and need, [and] is technically feasible.").

Accordingly, we cannot uphold the Corps' decision on practicability grounds.

*b. Aquatic impacts.* Second, an alternative must "have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). The Corps wisely does not argue this issue. As the draft Environmental Assessment concludes, the compression alternative would "eliminate 30 waterbody crossings . . . and impacts on wetlands." JA 212.

*c. Overall environmental impact.* That brings us to the final ground that the Corps may rely upon to reject the compression alternative. Even though compression may be "a practicable alternative . . . which would have less adverse impact on aquatic ecosystems," the Corps properly concluded that it would "have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Although the Corps' analysis is not pellucid, the Corps determined as a practical matter that the permanent impacts of compression are sufficiently "significant."

*i. The Corps deemed the environmental impact of compression too "significant" to endorse.* In its alternatives analysis, Tennessee Gas stated that "adding a

27

new (greenfield) compressor station would require Tennessee [Gas] to obtain approximately 40-acres per site," and that construction "would require permanent vegetation clearing from the area in order to install permanent access roads, fencing, buildings and other appurtenance equipment . . . resulting in increased impacts to the environment." *Id.* Tennessee Gas also observed that "a new (greenfield) compressor station would be an aboveground facility with light pollution and noise impacts and may also become a source of [greenhouse gas] emissions." *Id.* In contrast to those permanent environmental impacts, the land affected by the Orion Project "will be allowed to re-vegetate to minimize and mitigate possible environmental impacts." *Id.*

In its alternatives analysis, the Corps favored the Orion Project for those same reasons:

> [Tennessee Gas] examined several alternatives . . . including . . . Compression Alternatives . . . . The preferred alternative co-locates the new pipe within the existing right of way, thereby avoiding clearing of a new greenway. The majority of impacts are temporary, and will be restored to minimize the resultant impact. Permanent conversion in impacts are from one wetland type (PFO or PSS) to another wetland type (PEM), and do not result in wetlands being converted to uplands.

JA 438. The Corps articulated a clear preference for temporary environmental impacts, in direct contrast to the permanent impacts of compression cross-referenced in Tennessee Gas's report. The Corps' conclusion, therefore, amounts to judgment that permanent environmental impacts—including those from compression—are "significant" in this context.

Riverkeeper objects that the Corps never explicitly found any impact "significant." But the omission of that singular word is not fatal. Even if the agency's decision is "of less than ideal clarity," we will uphold it "if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Bowman*, 419 U.S. at 286). Here, the agency's path can reasonably be discerned: the Corps rejected the compression alternative on the ground that its permanent impacts—including permanent de-vegetation of forty to eighty acres of greenfield and light, noise, and greenhouse gas emissions—would be significant under 40 C.F.R. § 230.10(a).

*ii. The Corps' finding was not arbitrary or capricious.* Riverkeeper further objects that, even if the Corps implicitly found the permanent environmental impact of compression "significant," that finding was clearly erroneous. Applying our deferential standard of review, we reject that argument.

According to Riverkeeper, the Orion Project would result in "long-term impact[s] on forested areas (30 to 50 years to reach preconstruction mature tree size and densities)" on over 47 acres of forested uplands. JA 282. Additionally, the project would result in "222.6 more acres of total disturbed land, over a hundred more acres of impacts to agricultural lands, nearly 6 more acres of permanently deforested wetlands, 15 more acres of impacts to water resources, impact on 65 more wetlands and 31 more streams, and will traverse 2,100 feet of steep slopes." Reply Br. 15. By contrast, light, air, and sound pollution from compression were never quantified, according to Riverkeeper.

The Corps concedes that the Orion Project will disturb more land. But it is well supported in the record, and Riverkeeper does not dispute, that the land will be restored and allowed to revegetate. *See* JA 664 ("[I]f Tennessee [Gas] complies with the construction and restoration methods described . . . the impacts on waterbodies and wetlands would be minor and temporary."); JA 665 ("The required mitigation measures are adequately protective and will be enforced."). That regrowth may occur over a long period of time, but the compression alternative's impacts would continue indefinitely. And as for the Orion Project's permanent effects on wetlands, those were not concerning to the Corps based on its expert judgment. *See* JA 438 ("Permanent conversion in impacts are from one wetland type (PFO or PSS) to another wetland type

(PEM), and do not result in wetlands being converted to uplands.").

When evaluating the significance of certain aquatic impacts, the Corps is instructed to put "special emphasis on the persistence and permanence of the effects." 40 C.F.R. § 230.10(c); *see also id.* § 230.1 ("The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources."). We conclude that it was not a clear error of judgment for the Corps to apply similar reasoning to other kinds of environmental considerations, particularly when the Orion Project would not result in any net loss of wetlands or other aquatic resources.

Riverkeeper further objects that environmental impacts of compression cannot be "significant" under the Guidelines because FERC has found similar projects *not* significant under NEPA. *See Minisink Residents for Envtl. Pres. & Safety v. F.E.R.C.*, 762 F.3d 97, 104 (D.C. Cir. 2014). That analogy is unpersuasive because the requirements of NEPA are different and not at issue here.

By Riverkeeper's logic, the Corps could only reject an alternative as having "other significant adverse environmental consequences," 40 C.F.R. § 230.10(a), if the alternative would also constitute a "major Federal action[] significantly affecting the quality of the human environment" under NEPA, 42 U.S.C. § 4332(C). Riverkeeper's approach finds no support in any regulation

or case. It conflates two bodies of law with different text, authorship,[10] and purpose.

For example, finding significance under NEPA triggers a duty to prepare a full Environmental Impact Statement rather than a concise Environmental Assessment. *See Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 740 (3d Cir. 1982). If we were to adopt this definition of significance, the Guidelines would fail to address situations where an alternative's impact would be significant enough to be substantially worse for the environment than the proposed project, but would not be

---

[10] The Guidelines are promulgated by the Environmental Protection Agency, whereas NEPA's implementing regulations are promulgated by the Council on Environmental Quality. For purposes of NEPA, "significantly" is defined by regulation. *See* 40 C.F.R. § 1508.27. Riverkeeper does not, and cannot, argue that the same definition is controlling here. To the contrary, the Corps acted consistently with the understanding of significance expounded elsewhere in the Guidelines. *See, e.g.*, 40 C.F.R. § 230.3(o)(3)(v) ("For an effect to be significant, it must be more than speculative or insubstantial."); 40 C.F.R. § 230.10(c) ("Findings of significant degradation . . . shall be based upon appropriate factual determinations, . . . with special emphasis on the persistence and permanence of the effects.").

significant enough to constitute a "major Federal action[]." 42 U.S.C. § 4332(C). Nothing in § 230.10(a) requires the Corps to insist on such an alternative.

Even under NEPA, determining significance is more art than science. "By adding the word 'significantly,' . . . Congress apparently was willing to depend primarily upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure." *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 266 (D.C. Cir. 1988) (quoting *Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir. 1972)). Here, the Corps acted consistently with that understanding: it made a "good faith determination" that the permanent environmental consequences of certain alternatives, including compression, "would be sufficiently serious from an ecological standpoint" to prefer the Orion Project. *Id.*

Accordingly, the Corps' finding that the compression alternative had other significant adverse impacts on the environment, precluding its selection, was not arbitrary or capricious based on the record before us.

2

Riverkeeper's final argument is that the Corps erred by failing to conduct a water-dependency analysis and by failing to hold Tennessee Gas to a heightened standard applicable to non-water-dependent projects. While the

33

Corps did not make an explicit water-dependency finding, its failure to do so was harmless because the Corps took an appropriately hard look at the project alternatives.

As described above, a project is water dependent if it "require[s] access or proximity to or sit[s] within the special aquatic site in question to fulfill its basic purpose." 40 C.F.R. § 230.10(a)(3). "Examples of water dependent projects include, but are not limited to, dams, marinas, mooring facilities, and docks. The basic purpose of these projects is to provide access to the water." *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1261 (S.D. Fla. 2009) (quoting Army Corps of Engineers Standard Operating Procedures for the Regulatory Program (Oct. 15, 1999)), *aff'd*, 362 F. App'x 100 (11th Cir. 2010).

If the project is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). The applicant can "clearly demonstrate[] otherwise," *id.*, by putting forward "detailed, clear and convincing" information showing that non-aquatic alternatives are unavailable, *Utahns for Better Transp.*, 305 F.3d at 1186. "This does not require a specific level of detail to rebut the presumption, but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012).

Here, Riverkeeper is correct that the Corps did not make any finding regarding water dependency. But that was harmless error. Assuming that the Orion Project is not water dependent, and assuming that Tennessee Gas was required to overcome a heightened burden, the Corps' determination was still sufficient. Based on Tennessee Gas's environmental report, combined with the Corps' concern with permanent environmental impacts, we conclude that the Corps "took a hard look at the proposals and reached a meaningful conclusion based on the evidence." *Hillsdale*, 702 F.3d at 1168.

To be sure, the Corps did not conduct a detailed analysis of the compression alternative. But under the principle of commensurate review, it was not required to do so. "Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." 40 C.F.R. § 230.10; *see also id.* § 230.6(a). The Corps explicitly endorsed Tennessee Gas's analysis under that rubric: "Based upon the level of impact to aquatic resources, it was determined that the alternatives analysis carried out in order to avoid aquatic resource impacts was commiserate [sic] with the level of impact." JA 438.

Thus, we conclude that the Corps acted in accordance with the applicable regulations when it rejected the compression alternative.

35

## V

For the foregoing reasons, we will uphold the decision of the Corps and deny the petition for review.